JUDGE DANIELS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

14 CV 4057

UNITED STATES OF AMERICA,

Plaintiff,

v.

HAROLD LEVINE,

Defendant.

RECEIVED JUN 04 2014 U.S.D.C. S.D. N.Y. CASHIERS

**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF**

Plaintiff, United States of America, for its complaint against defendant Harold Levine, states as follows:

## PRELIMINARY STATEMENT

1. Defendant Harold Levine, an experienced tax attorney who has served as head of the tax practice groups at both the New York City offices of Herrick, Feinstein LLP ("Herrick Feinstein") and Moritt Hock & Hamroff LLP, has promoted, implemented and/or participated in at least 90 unlawful tax schemes designed to cheat the Government out of hundreds of millions of dollars in tax liability. As set forth more fully below, in many of these illegal tax schemes, Levine, operating together with other known tax-shelter promoters, used companies with phony losses on their books to shield millions of dollars of income garnered by other companies disposing of their assets. In an attempt to disguise the illegitimacy of these transactions, Levine knowingly told lies or caused the corporations involved in these unlawful transactions to tell lies concerning the supposed tax benefits of the transactions. Levine also attempted to conceal the unlawful tax schemes from the Internal Revenue Service (the "IRS") by structuring certain transactions to evade IRS notices advising the public about the potential tax ramifications of

these transactions. Levine also failed to disclose information regarding these illicit transactions to the IRS, despite his obligations under the Internal Revenue Code to disclose such information. As a result of Levine's illegal tax schemes, the IRS has made or will make federal tax assessments totaling approximately $130 million, not including penalties or interest, virtually all of which may be uncollectible. At the expense of the IRS, Levine profited handsomely, acquiring over $5 million in fees for his role in these unlawful transactions.

2. The United States brings this complaint pursuant to 26 U.S.C. §§ 7402 and 7408 of the Internal Revenue Code ("IRC") to enjoin Levine, and all those in active concert or participation with him, from directly or indirectly:

i. Organizing, promoting or selling any plan or arrangement – including but not limited to the intermediary transaction tax schemes and the state tax credit transaction tax schemes described in this complaint or any similar plans or arrangements – that advises or assists others in violating or attempting to violate the internal revenue laws or unlawfully evading the assessment or collection of their federal tax liabilities;

ii. Engaging in conduct subject to penalty under IRC § 6700, including, but not limited to, making, in connection with the organization or sale of any plan or arrangement, any statement about the securing of any tax benefit that Levine knows or has reason to know is false or fraudulent as to any material matter;

iii. Engaging in conduct subject to penalty under IRC § 6707, including, but not limited to, failing to file a return or statement with the IRS that identifies and describes any reportable or listed transaction, any potential tax benefits expected to result from that transaction, and other information required by statute;

iv.     Engaging in conduct subject to penalty under IRC § 6708, including, but not limited to, failing to furnish the IRS with a list that identifies all customers who have participated in listed or reportable transactions when the IRS requests such a list and the list is required to be maintained pursuant to statute; and

v.     Engaging in any other conduct that interferes with the administration or enforcement of the internal revenue laws, including but not limited to implementing and participating in the intermediary transactions and state tax credit transactions or any similar tax schemes.

## JURISDICTION AND VENUE

3.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1340 and 1345, and by IRC §§ 7402 and 7408.

4.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action took place in this judicial district and because the defendant Harold Levine resides in this judicial district as of the time this action is filed.

## AUTHORIZATION

5.     This action for injunctive relief is brought at the request of the Chief Counsel of the Internal Revenue Service, a delegate of the Secretary of the Treasury, and commenced at the direction of a delegate of the Attorney General of the United States, pursuant to IRC §§ 7401, 7402 and 7408.

## DEFENDANT

6.     Defendant Harold Levine is an attorney who is licensed to practice law in the State of New York.  He received a Juris Doctor from Benjamin N. Cardozo School of Law in 1983, and he received an LL.M. in Taxation from New York University School of Law in 1984.

7.     Levine currently practices law at Moritt Hock & Hamroff, LLP, located at 450 Seventh Avenue, 15th Floor, New York, New York, 10123.  According to Moritt Hock & Hamroff's website, Levine "concentrates his practice in all aspects of complex tax law."

8.     Earlier in his career, Levine practiced law at several other law firms.  Between 2002 and 2012, Levine practiced at Herrick Feinstein.  During his tenure at Herrick Feinstein, Levine served as a Partner, Co-Chair of the law firm's Tax and Personal Planning Department, and head of the Tax Group.  According to Herrick Feinstein's website, Levine "concentrate[d] his practice in all aspects of tax law, particularly tax planning with respect to partnerships, limited liability companies, C corporations and Subchapter S corporations."

**ADDITIONAL PLAYERS INVOLVED IN LEVINE'S TAX SCHEMES**

9.     John P. "Sean" McNabola ("McNabola") is a chartered accountant who resides in Dublin, Ireland.   Each of the five Promoter Corporations (defined *infra* in paragraphs 15 to 20 herein) was formed on behalf of McNabola, four of them with assistance from Herrick Feinstein. The Promoter Corporations were owned by a series of entities controlled by McNabola, including Green Isle Property Holdings Limited, Green Isle Trust, and Earlsfort Trust, the ultimate owner.  Earlsfort Trust was established in Dublin, Ireland, for the benefit of McNabola's wife and children.

10.     McNabola signed operative documents for some of the tax shelter transactions described herein on behalf of the Promoter Corporations for which he served as an officer. McNabola netted millions of dollars of profit from these tax shelter transactions.

11.     Ron Katz ("Katz") is a certified public accountant and close associate of Levine. Entities owned by Katz alone, or co-owned with Levine, received millions of dollars of profit from the intermediary transactions described herein.  These entities, including King Louie

Enterprises LLC and HRK Real Estate Holdings LLC, are believed to have received these profits on behalf of Levine.

12.     Timothy Conn Vu ("Conn Vu") is a tax practitioner who, in or around 2006, was hired to serve as an officer and/or director of the five Promoter Corporations involved in the intermediary transactions and state tax credit transactions described herein. Conn Vu signed many of the operative documents for the tax shelter transactions described herein, on behalf of the Promoter Corporations for which he served as an officer and/or director.

13.     Fred Forster ("Forster"), co-founder of the promoter firm Fortrend International LLC, provided financing to Promoter Corporations controlled by McNabola in connection with certain of the intermediary transaction tax schemes described herein.

14.     Graham Taylor ("Taylor") is a tax attorney in San Francisco who provided advice to McNabola regarding the abusive distressed asset debt ("DAD") and distressed asset trust ("DAT") tax shelters that were used to offset taxable income from the abusive tax shelter transactions described herein. While Taylor was indicted in November 2005 for unrelated tax fraud, and pled guilty in November 2008 to tax evasion, he continued to practice law and provide advice to McNabola through at least 2008.

**COMPANIES USED TO PERPETRATE LEVINE'S TAX SCHEMES**

15.     Levine, through his law firm Herrick Feinstein, formed and/or used five entities – First Active Capital Inc.; ILP Capital, Inc.; Anglo Capital Inc.; BOI Capital Inc. and AIB Capital Inc. (collectively, the "Promoter Entities" or "Promoter Corporations") – in promotion of illegal tax shelters. The Promoter Entities reported bad debt losses on their tax returns, and used these purported losses to offset the gains and income generated from asset sales made by the target companies they acquired, as well as from state credit transactions and other transactions.

A. **First Active Capital Inc.**

16. First Active Capital Inc. ("First Active") was incorporated on August 19, 2005, in the State of Delaware by attorney Graham Taylor. McNabola was the initial director and officer of First Active, and maintains control of the company. On August 10, 2006, Tim Conn Vu was elected president, secretary, and treasurer of First Active, and on February 27, 2008, became its director. First Active participated in at least five intermediary transactions, and via Agate LLC ("Agate"), a company in which First Active is the sole member, participated in numerous state tax credit transactions between 2005 and 2010. In addition, First Active also acquired a target company in which Levine was an investor, and which had income from a lawsuit settlement. Levine served as the Vice President of First Active on several occasions in connection with First Active's promoter activities, and represented Agate in connection with state tax credit transactions.

B. **ILP Capital, Inc.**

17. ILP Capital, Inc. ("ILP Capital") was incorporated on July 25, 2006, in the State of Delaware by an attorney at Herrick Feinstein. As of the date of incorporation, McNabola was the sole director of ILP Capital. Beginning August 2, 2006, Timothy Conn Vu served as president, secretary and treasurer of ILP Capital. Beginning August 30, 2006, McNabola served as vice president of ILP Capital. ILP Capital participated in one intermediary transaction, and Levine served as the attorney for ILP Capital in connection with this transaction.

C. **Anglo Capital Inc.**

18. Anglo Capital Inc. ("Anglo Capital") was incorporated on February 14, 2006, in the State of Delaware by an attorney at Herrick Feinstein. McNabola was the initial president, secretary, treasurer and director of Anglo Capital. Beginning in or around August 2006,

Timothy Conn Vu served as the president, secretary, and treasurer of Anglo Capital, and became its director in 2008. Between 2006 and 2008, Anglo Capital participated in at least seven intermediary transactions, at least one state tax credit transaction, and at least one other tax avoidance transaction involving the sheltering of income from a partnership investment. Levine participated as an investor in at least one of the aforementioned transactions involving Anglo Capital. Levine also represented Anglo Capital or the target companies in connection with the aforementioned transactions.

**D. <u>BOI Capital Inc.</u>**

19. BOI Capital Inc. ("BOI Capital") was incorporated on August 2, 2007, in the State of Delaware by an attorney at Herrick Feinstein. Conn Vu served as the president of BOI Capital. McNabola served as the director of BOI Capital until 2008, when Conn Vu became the director. BOI Capital participated in state tax credit transactions, and Levine served as the attorney for BOI Capital in connection with these transactions.

**E. <u>AIB Capital Inc.</u>**

20. AIB Capital Inc. ("AIB Capital") was incorporated on August 2, 2007, in the State of Delaware, by an attorney at Herrick Feinstein. Conn Vu served as president of AIB Capital. McNabola served as the director of AIB Capital until 2008, when Conn Vu became the director. AIB Capital participated in state tax credit transactions after First Active ran out of bad debt losses to offset income from Agate, and Levine served as the attorney for AIB Capital in connection with these transactions.

**DEFENDANT'S INTERMEDIARY TRANSACTION TAX SCHEME**

21. An intermediary transaction tax shelter is a method of avoiding corporate level taxes from the transfer of ownership of a corporation and its assets. Ordinarily, a company's

shareholders wishing to dispose of either the entire company or the majority of its assets will face two levels of taxation: first at the corporate level arising from the sale of the company's assets, and second at the individual shareholder level when the company distributes the proceeds of the asset sale to the shareholders in a liquidating distribution.  While a shareholder would thus prefer to sell his/her stock rather than have the company first sell its assets, the competing interest of the asset buyer – to obtain a tax basis in the purchased assets equal to the price paid for them – means that the selling shareholder must often settle for an asset purchase transaction.

22.   The intermediary transaction enables the selling shareholders to obtain most of the tax benefits of the stock sale while the buyers obtain the tax benefits of an asset purchase.  In a typical transaction, a so-called "intermediary" corporation acquires the stock of the target company with the potential tax bill shortly before or after selling off the company's appreciated assets to the asset purchaser.  The intermediary may then act to eliminate the corporate tax liability by, for example, merging the target company with a company that has questionable losses to offset the target's gain.  Because the intermediary intends to shelter the taxable gain arising from the asset sale, all parties to the transaction benefit:  the selling shareholders receive a premium price for their stock (higher than what they would have received had they simply sold the company's assets and liquidated), the intermediary receives a portion of the tax savings in the form of a fee, and the asset purchaser obtains the stepped-up basis in the asset purchased.

*IRS Notices Regarding Intermediary Transactions*

23.   In 2001, the IRS issued Notice 2001-16, which describes intermediary transaction tax shelters and advises taxpayers and their representatives of certain responsibilities that may arise from participating in these transactions.

24.   As described in Notice 2001-16, intermediary transactions typically involve four parties: (1) a corporation owned by shareholders and owning assets (the "Target Corporation"); (2) a seller (the "Seller") who desires to sell his or her stock in the Target Corporation; (3) an intermediary corporation, or promoter entity; and (4) a buyer (the "Buyer") who wants to purchase the assets of the corporation.   In the transaction, the Seller sells the stock of the Target Corporation to the promoter entity, and the Target Corporation sells its assets to the Buyer.   After the stock purchase, the Target Corporation will avoid paying any tax on the gain from the asset sale.   In one variation of the tax shelter, the Target Corporation is included as a member of the promoter entity's affiliated group.   The promoter entity files a consolidated return and reports losses that offset the capital gain taxes that result from the Target Corporation's sale of its assets to the Buyer.

25.   Notice 2001-16 states that the IRS may challenge the tax results of an intermediary transaction, and may assert penalties on individuals who promote or participate in these transactions.   Notice 2001-16 also identifies intermediary transactions as "listed transactions" under 26 C.F.R. § 1.6011-4.   This means that the intermediary transactions are the "same or substantially similar to one of the types of transactions that the IRS has determined to be a tax avoidance transaction." *See* 26 C.F.R. § 1.6011-4.

26.   In 2008, the IRS issued Notice 2008-111, clarifying Notice 2001-16.   Notice 2008-111, which is effective as of January 19, 2001, provides, in part, that a transaction must include the following four components to be treated as an intermediary transaction tax shelter described in Notice 2001-16:

a.   First, the Target Corporation, directly or indirectly, owns assets the sale of which would result in a taxable gain (the "Built-In Gain Asset").   As of the date of the sale of its

stock to the promoter entity, the Target Corporation does not have sufficient tax benefits to eliminate or offset the taxable gain.

   b.     Second, at least 80 percent of the Target Corporation's stock is disposed of by the Seller in one or multiple transactions within a 12-month period.

   c.     Third, within 12 months before or after the disposal of 80 percent of the Target Corporation's stock, at least 65 percent of the Target Corporation's Built-In Gain Assets are disposed of to one or more Buyers in one or more transactions in which a gain is recognized.

   d.     Fourth, at least half of the tax resulting from the sale of the Target Corporation's Built-In Gain Assets is offset, avoided or not paid.

   27.   The Internal Revenue Code and the Treasury Regulations require that taxpayers who participate in listed transactions disclose their participation by filing disclosure statements with their federal income tax returns.  *See* IRC § 6111.

   28.   A material advisor as to a listed transaction also is required to file a report with the IRS identifying and describing the listed transaction and the potential tax benefits expected to result from the transaction.  A material advisor must furnish the IRS with this information as to each occurrence of each listed transaction that s/he promotes.  If a material advisor fails to provide the IRS with this information, s/he is subject to penalties.  *See* IRC §§ 6111, 6707(a).

   29.   In addition, a material advisor as to a listed transaction also is required to maintain a list of all customers who participate in a listed transaction that must be furnished to the IRS upon request.  *See* IRC §§ 6112, 6708.

   *Levine's Promotion of and Participation in Intermediary Transactions*

   30.   Starting as early as 2005, Levine promoted, implemented, and/or participated in at least 13 intermediary transaction tax schemes that enabled corporations to illegally avoid paying

corporate income taxes on the gains received from the sale of corporate assets, while generating a profit for Levine equal to some portion of the sheltered gains. Levine promoted, implemented, and/or participated in each of these schemes through use of three of the Promoter Entities: First Active, Anglo Capital and ILP Capital.

31.  The intermediary transactions that Levine promoted generally included three primary steps.

32.  In step one of the intermediary transaction tax scheme, the Target Corporation sold some or all of its assets to a Buyer, in exchange for cash.

33.  In step two of the intermediary transaction tax scheme, the promoter entity (here, First Active Capital, Anglo Capital, or ILP Capital) purchased the shares of the Target Corporation less than 12 months before or after the asset sale, purportedly for investment purposes. In exchange, the shareholders of the Target Corporation received cash from the promoter entity. The promoter entity purchased the shares using acquisition loans it secured. Pursuant to the stock purchase agreement, the promoter entity agreed to be responsible for the Target Corporation's income taxes and capital gains taxes after it acquired the Target Corporation.

34.  In step three of the intermediary transaction tax scheme, the promoter entity generally reported the Target Corporation's income or capital gains on its tax return. The promoter entity offset all of the income or gain using bad debt deductions. As a result, the Target Corporation did not pay any tax on the gains from the sale of its assets.

35.  The cash received by the Target Corporation from the asset sale was used to repay the loan secured by the promoter entity to purchase the Target Corporation's stock. The remaining

proceeds from the asset sale constituted the profits earned by the promoter entity, Levine, and other participants in the intermediary transaction.

36.    In each of the Intermediary Transactions that Levine promoted, Levine represented either the promoter entity and/or the Target Corporation selling its shares.  Funds from each of the intermediary transactions were generally placed under Levine's control and distributed through Herrick Feinstein's escrow accounts.

37.    In certain of the intermediary transaction tax shelters that Levine promoted, steps were taken to alter the transaction structure so as to make them superficially appear different from the transactions listed in Notice 2001-16 and Notice 2008-111.

38.    For example, in one intermediary transaction promoted by Levine involving Knatten Inc. as the target corporation, the transaction structure was changed so that the promoter entity purchased the shares of the foreign entity that owned Knatten Inc. instead of purchasing the shares of Knatten Inc. itself.

39.    In other intermediary transactions promoted by Levine, involving target corporations PAF Trading Corp., ROQO Equities, Inc., and 691 Eighth Avenue, each target corporation sold real estate assets to a Buyer under a like-kind, tax deferred exchange agreement pursuant to IRC § 1031 (the "1031 agreement").  The proceeds from the asset sale were placed in an escrow account, to be used to purchase replacement property pursuant to IRC § 1031.  However, after the asset sale and the stock purchase, the sale proceeds in the escrow account were distributed to the promoter entity and other participants in the transaction, thereby cancelling the 1031 agreement.

40.    And in yet another intermediary transaction promoted by Levine, involving VMH Equities Corp., the structure of the transaction was changed so that the stock sale took place in

two steps rather than one, as an attempt to avoid Notice 2008-111, which had just recently been issued by the IRS.

41. Each one of the intermediary transaction tax schemes promoted by Levine was the same as, or superficially disguised to avoid, the listed transactions described in IRS Notice 2001-16 and Notice 2008-111.

**SPECIFIC EXAMPLES OF THE INTERMEDIARY TRANSACTION TAX SCHEMES**

42. First Active, Anglo Capital and ILP Capital were formed to engage in intermediary tax schemes that Levine promoted, implemented, or otherwise participated in.

**First Active: The PAF Trading Corporation ("PAF") Transaction**

43. Beginning in late 2005, Levine promoted an intermediary tax transaction scheme using First Active to a private real estate investor firm (the "Investor Firm"), which was a longstanding client of his law firm, Herrick Feinstein. The transaction involved multiple steps, some of which were inserted in an attempt to disguise the true nature of the transaction as an unlawful intermediary tax transaction.

*The PAF Transaction*

44. The Investor Firm, which invests in large real estate projects, was interested in acquiring the Manhattan commercial property owned by PAF at 148 Lafayette Street.

45. To accomplish this, first, the Investor Firm formed two entities, which they controlled: Ball 148 Acquisition, LLC ("Ball 148"), and 148 Lafayette, LLC ("148 Lafayette"). Ball 148 was formed to purchase PAF's stock, while 148 Lafayette was formed to purchase PAF's Manhattan property. Levine advised the Investor Firm regarding tax issues pertaining to this structure.

46. PAF's shareholders sold their PAF stock to Ball 148, as planned, on January 9, 2006, for $30,000,000.

47. Approximately two weeks later, on January 24, 2006, PAF entered into an agreement to exchange the Manhattan property in a like-kind, tax deferred exchange pursuant to IRC § 1031 (the "PAF 1031 agreement"). Levine represented PAF in connection with this agreement, and executed the agreement. The PAF 1031 agreement obligated PAF to identify replacement property within 45 days of the exchange.

48. The parties, however, never completed and never intended to complete a like-kind, tax deferred exchange pursuant to IRC § 1031.

49. On January 25, 2006, one day after PAF entered into the PAF 1031 agreement, PAF sold the Manhattan property to 148 Lafayette for $33,425,303, and deposited those proceeds in an escrow account, in accordance with the 1031 agreement (the "1031 escrow account"). Levine again represented PAF in connection with PAF's sale of the Manhattan property and executed the asset purchase agreement on PAF's behalf.

50. On January 27, 2006, Ball 148 sold the PAF stock it had purchased a few weeks earlier to First Active for $29,825,000. The stock sale closed at the law offices of Herrick Feinstein. At this time, PAF had cash of $33,425,303, held in the 1031 escrow account, and a 2006 tax liability arising from the sale of the Manhattan property. PAF had no other assets.

51. First Active financed the purchase of PAF stock by securing a loan of $29,800,000 from a bank (the "Bank").

52. The stock purchase agreement governing the stock sale to First Active represented that the proceeds from the sale of the Manhattan property, which resided in the 1031 escrow account (*see supra* ¶ 49), were deposited there "for the express purpose of purchasing

replacement property in a manner consistent with Section 1031 of the [Internal Revenue] Code and the Treasury Regulations promulgated thereunder." The stock purchase agreement was signed by McNabola as President of First Active.

53.   This representation was false. In fact, on January 27, 2006 – the same day the sale of PAF stock to First Active closed – the PAF 1031 agreement was cancelled. The proceeds from the sale of the Manhattan property – $33,425,303 – which were purportedly maintained in the 1031 escrow account for the express purpose of purchasing replacement property pursuant to IRC § 1031, were instead used to repay the Bank's loan immediately after the stock purchase closing on January 27, 2006, with the remaining proceeds distributed to First Active and its associates as its profit for participating in the transaction. In other words, cash was simply exchanged for cash. Indeed, even prior to the cancellation of the PAF 1031 agreement, First Active used the money held in the 1031 escrow account as collateral for the loan it received to purchase PAF's stock.

54.   McNabola, with Levine's assistance, directed the distribution of profits from this transaction from the 1031 escrow account, and did so as follows: (1) $32,147,803 to the Bank; (2) $1,242,500 to HRK Real Estate Holdings, a company controlled by Levine and Ron Katz; and (3) $25,000 to the attorney who purportedly represented First Active in this transaction. McNabola further directed the Bank to distribute profits from this transaction as follows: (1) $298,250 to the Bank as a loan facility fee; (2) $687,941 to McNabola via two foreign entities; and (3) $1,336,612 to DAC Management China for First Active's use of bad debt losses to offset the gains from this transaction and thus unlawfully avoid corporate income tax, as described below.

55.   On February 14, 2006, PAF purportedly merged into First Active pursuant to IRC § 368(a)(1)(F).   The real estate activities of PAF were not continued following this merger. Levine's associate at Herrick Feinstein prepared the merger documents for both PAF and First Active, and those documents were executed by McNabola on behalf of both companies.   Levine assisted in gathering financial information for purposes of preparing and presenting First Active's tax return.

56.   Levine knew that the real estate activities of PAF would not continue following the merger, and further knew that First Active intended to offset the gains acquired from the sale of the Manhattan property with losses so as to avoid payment of corporate income tax.

57.   First Active's 2006 tax return reflected long-term capital gains totaling $32,911,053 from the sale of PAF's Manhattan property.  However, as Levine knew, the full amount of the gain was offset by First Active's bad debt losses, which consisted of a portfolio of distressed, nonperforming commercial loans located in the People's Republic of China (the "Chinese bad debt").  First Active had acquired the Chinese bad debt from DAC Management, a foreign entity, for approximately $927,000, yet claimed the debt had an adjusted basis at the time of the transfer in excess of $57 million.  Levine knew or should have known that the Chinese bad debt could not lawfully supply losses against which First Active's gains could be offset.

58.   The PAF transaction should have been disclosed to the IRS because it was in fact an intermediary transaction superficially disguised to avoid resemblance to the unlawful transactions set forth in IRS Notices 2001-16 and 2008-111.  However, the PAF transaction was not disclosed to the IRS on any tax return. Nor did Levine disclose this transaction in response to the IRS's request pursuant to IRC § 6112, which was issued to him on or about February 14, 2012.

*Levine's False Tax Opinion Letter*

59.     Levine also knowingly furnished false tax advice concerning whether the PAF transaction needed to be reported to the IRS.  As head of the tax department at Herrick Feinstein, Levine approved an opinion letter issued by Herrick Feinstein on March 26, 2006 (the "Herrick Feinstein opinion letter"), which concluded that the PAF transaction was not substantially similar to IRS Notice 2001-16 and thus need not be disclosed to the IRS.  The opinion letter was prepared at the request of a potential investor in 148 Lafayette (the "Investor").

60.     The Herrick Feinstein opinion letter advised, among other things, that the transaction was not substantially similar to IRS Notice 2001-16 because "[t]he transaction does not aim to avoid the tax on the sale of the [Manhattan] [p]roperty, but instead, gain on the sale of the [p]roperty is merely deferred through the means of a like-kind exchange afforded to taxpayers pursuant to Code Section 1031."

61.     But as Levine knew, the § 1031 component of the PAF transaction had been cancelled at the time PAF's stock was sold to First Active back on January 27, 2006, and was never otherwise accomplished.  Indeed, Levine had arranged for and directed the disbursement of funds from the 1031 escrow account to First Active and associates profiting on the deal, including over one million dollars to a company that he co-owned – funds that were supposedly intended for purchase of a replacement property.  (*See supra* ¶ 54).

62.     The Herrick Feinstein opinion letter also falsely advised that "the abuses described in Notice 2001-16 were not involved in the Transaction. It is our understanding that [PAF] will not have its gains offset with losses from its affiliated group and that no entity will contribute loss assets to [PAF] to offset the gain."  But again, Levine knew this was false.  As described above,

Levine knew that the gain resulting from the sale of PAF's Manhattan property would be offset by First Active's losses upon merger of the two companies. (*See supra* ¶¶ 56-57).

**First Active: The VMG Equities Corp. ("VMG") Transaction**

63.    Beginning late 2005, Levine promoted an unlawful intermediary tax transaction scheme using First Active to the owner of the sole shareholder of the target corporation, VMG (the "VMG Owner").

*The VMG Transaction*

64.    VMG was a New York corporation formed on February 6, 2004.

65.    VMG was a single purpose entity that had invested as the majority member of a company engaged in the development of a residential condominium building in New York City (the "Real Estate Development Company"). All units in the building were completed and sold as of November 30, 2005, generating a gain of approximately $5,666,625 to VMG. VMG subsequently sold its interest in the Real Estate Development Company to another company controlled by the VMG Owner. As a result, VMG's only asset was cash of $6,907,524.

66.    On December 7, 2005, the VMG Owner entered into a stock purchase agreement to sell its stock in VMG to First Active for $6,200,000, which represented approximately 90% of the cash that was VMG's only asset. VMG also held a 2005 tax liability of over $1.6 million from, among other things, the sale of partnership property.

67.    Levine introduced the VMG Owner to First Active and told him that, in exchange for selling VMG's shares to First Active, First Active was willing to pay approximately $6,200,000 (notwithstanding that VMG had $6,907,524 and a tax liability of over $1,600,000). Levine advised the VMG Owner to sell the VMG shares to First Active and represented the VMG Owner in the stock sale transaction, including assisting in gathering financial information to be

included on First Active's tax returns. The VMG Owner signed the stock purchase agreement, and McNabola signed the stock purchase agreement on behalf of First Active.

68.    First Active, controlled by McNabola, paid the VMG Owner for the VMG shares in part by obtaining financing from Prime Asset Business Trust ("PABT"), also controlled by McNabola, in the amount of $5,870,000. McNabola signed the credit agreement as President of both First Active and PABT. First Active paid the VMG Owner the remaining $330,000 owed for the shares from a sub-account of Herrick Feinstein's escrow account attributable to another Target Corporation (*see infra* ¶ 70).

69.    First Active repaid PABT using the proceeds VMG received from the sale of the condominium building. Notably, the repayment of the PABT loan also occurred on December 7, 2005 – the very same day the PABT loan was made. In other words, cash was simply exchanged for cash, and the remaining proceeds – approximately $707,524 – were distributed to First Active and others as profit for participating in the transaction.

70.    The money transfers were completed through Herrick Feinstein's escrow account, which was under the control of Levine, and the profits from the VMG transaction were distributed as follows:  (1) $305,000 to King Louie Enterprises, LLC (owned by Ron Katz), a portion of which was then sent to companies owned in whole or in part by Levine; (2) $351,710 to DAC Management China for First Active's use of bad debt losses to offset the gains from this transaction and thus unlawfully avoid corporate income tax; (3) $137,300 to McNabola via a foreign entity; and (4) $49,900 to Graham Taylor, via his employer, for legal services on behalf of First Active. After these distributions, there was $152,789 remaining in the Herrick Feinstein escrow account, which includes funds commingled with the proceeds of a substantially similar intermediary transaction promoted by Levine involving another Target Corporation.

71.   Following the stock sale to First Active, Levine was appointed Vice President of both First Active and VMG.  As had been intended at the time the transaction was concocted, on December 27, 2005, VMG purportedly merged into First Active pursuant to IRC § 368(a)(1)(F). Levine signed both the Agreement and Plan of Merger and the Certificate of Merger, on behalf of both First Active and VMG, as Vice President of both companies.

72.   As Levine knew, the purpose of the merger between First Active and VMG was to offset VMG's income with losses so as to avoid payment of corporate income tax.

73.   First Active's 2005 tax return reflected flow-through income of $5,666,625 resulting from VMG's majority share of the company engaged in condominium development.  However, as Levine knew, the full amount of this gain was offset by inflated Chinese bad debt held by First Active.  Levine knew or should have known that there was no reasonable likelihood that the inflated Chinese bad debt could lawfully be used to offset First Active's gains.

74.   The sale of stock in VMG to First Active was, in substance, a diversionary tactic, lacking economic substance, to save the VMG Owner from corporate tax liability resulting from the gain on the sale of its real estate investment.  The only "profit" generated by this transaction was the elimination of federal tax liability, which "profit" was then split amongst the participants in the transaction.  For example, by engaging in the intermediary transaction with First Active, the VMG Owner received significantly more cash than he would have received if VMG had liquidated and distributed its assets directly to him as the shareholder.  The promoters and their affiliates in turn received a premium of approximately $707,524 for participating in the transaction.  Absent the preplanned elimination of the corporate tax on the gain from the sale of VMG's assets, there would be no economic benefit or business purpose in engaging in the intermediary transaction.

75.    This intermediary transaction was the same as or substantially similar to the unlawful transactions set forth in IRS Notices 2001-16 and 2008-111, and should have been disclosed to the IRS.  However, it was not disclosed on VMG's tax return, First Active's tax return, or any other tax return, for the year ending December 31, 2005.  Nor did Levine disclose this transaction in response to the IRS's request pursuant to IRC § 6112, which was issued to him on or about February 14, 2012.

*False Representations Contained in the Stock Purchase Agreement*

76.    The stock purchase agreement governing the VMG transaction, negotiated by Levine on behalf of the VMG Owner and signed by the VMG Owner and McNabola, contained several material representations with respect to securing tax benefits that Levine knew or should have known were false.

77.    For example, the stock purchase agreement included the representation and warranty – made by both the seller and purchaser – that the "execution, delivery, and performance" of the stock purchase agreement "does not and will not . . . require . . . mak[ing] any filing with, or notification to, any . . . Governmental Authority."  In fact, as Levine knew or should have known, the participants in this transaction were obligated to disclose the transaction to the IRS as a reportable transaction pursuant to IRS Notices 2001-16 and 2008-111.

78.    The stock purchase agreement also included the false representation that no person or entity is entitled to any fee or commission in connection with the transaction "based upon arrangements made by or on behalf of" Eclogue or VMG.  In fact, as described *supra*, ¶ 70, First Active's associates, including Levine, received fees in connection with this transaction.

79.    Similarly false was First Active's representation that it was acquiring VMG's shares "for investment."  Instead, as Levine knew or should have known, First Active did not intend and

did not in fact continue any business activities with respect to VMG and did not invest any VMG shares. Rather, First Active caused VMG to merge into First Active, distributed VMG's cash to the promoters, and then offset the taxable gains from the transaction using the Chinese bad debt.

80. First Active also represented in the stock purchase agreement that it would "pay all . . . Taxes of [VMG] that are due." To the contrary, as Levine knew or should have known, First Active never intended to pay taxes to the IRS and in fact never paid taxes to the IRS; rather, it intended to and did purportedly eliminate taxes owed by unlawfully offsetting VMG's gains, which were reported by First Active, with the Chinese bad debt losses.

**Other Intermediary Transactions Involving First Active**

81. Using First Active, Levine also promoted, implemented, and participated in similar intermediary schemes involving the following target corporations: NOF, LLC on or about December 7, 2005; 254 W. 54th Street, Inc. on or about December 13, 2005; and UNO Estates Limited on or about February 9, 2006. In addition, again using First Active, Levine also promoted, implemented, and participated in a transaction involving 63 Wall, Inc. on or about January 1, 2007, which generated taxable corporate income that was also set off by the Chinese bad debt, thus also allowing evasion of corporate income taxes.

82. With respect to each of the intermediary transactions listed in paragraph 81, and the transaction involving 63 Wall, Inc., Levine assisted in gathering financial information for purposes of preparing and presenting First Active's tax returns.

83. Each of the intermediary transactions listed in paragraph 81 should have been disclosed by Levine to the IRS in response to the IRS's request pursuant to IRC § 6112, which was issued to him on or about February 14, 2012. Levine disclosed none of the transactions.

84.   Levine failed to file with the IRS a return or statement that identifies or describes any of the intermediary transaction tax schemes that he organized and/or promoted using First Active.

**Anglo Capital: The ROQO Transaction**

85.   Beginning on or around May 2005, Levine promoted an unlawful intermediary transaction tax scheme to another Herrick Feinstein client, which owns, develops and manages real estate (the "Real Estate Developer").

86.   The Real Estate Developer was interested in purchasing a rental apartment building owned by ROQO Equities, Inc. ("ROQO"). However, the owners of ROQO were unwilling to sell the building asset, and insisted that the Real Estate Developer purchase the shares of ROQO in order to acquire the building.

87.   A representative from the Real Estate Developer consulted with Levine, the attorney for the Real Estate Developer for tax matters, regarding the Real Estate Developer's interest in purchasing ROQO and its asset.  Levine informed the representative that he had a pool of purchasers that buy C corporations and are able to absorb the built-in gain with their own losses. Levine advised the Real Estate Developer's representative that he could acquire the building "free of gains problem," and described the transaction as an accepted structure.

88.   The Real Estate Developer understood from Levine's conversation with its representative that Levine's clients could legally absorb the built-in gains.

89.   Levine also advised the representative of the Real Estate Developer that a like-kind, tax deferred exchange structure could be used for the ROQO transaction.

90.   Levine advised the Real Estate Developer that, although he was not in control of the fee for use of Anglo Capital to buy the stock of ROQO, the fee likely would be between 12.5 to

15 percent of the gain. Levine later introduced the Real Estate Developer to McNabola and, upon information and belief, arranged a telephone call in which the Real Estate Developer and McNabola negotiated the fee amount.

91. On December 21, 2006, 22 East 31st Street LLC, an entity created by the Real Estate Developer, acquired all of the shares of ROQO. Levine, through Herrick Feinstein, represented 22 East 31st Street LLC in connection with this stock purchase.

92. On August 8, 2007, ROQO sold the rental apartment building to another entity related to the Real Estate Developer, for $5,650,000.

93. On August 8, 2007, ROQO entered into an exchange agreement to exchange the rental apartment building in a like-kind, tax deferred exchange pursuant to IRC § 1031 (the "ROQO 1031 agreement"). Herrick Feinstein represented ROQO in connection with the ROQO 1031 agreement; an associate at Herrick Feinstein is listed as the attorney to whom notices should be sent on behalf of ROQO.

94. Under the ROQO 1031 agreement, the rental apartment building was transferred to the purchaser, 22 East 31st Owner LLC. The ROQO 1031 agreement further provided that the proceeds from the sale of the rental apartment building would be held in a qualified exchange account under § 1031 (the "1031 exchange account") until ROQO has located suitable replacement property to exchange for the rental apartment building. The 1031 agreement stated that ROQO must identify replacement property within 45 days of the date that the rental apartment building was transferred.

95. The proceeds from the sale of the rental apartment building were placed in a 1031 exchange account for the purported purpose of purchasing replacement property pursuant to IRC § 1031.

96.   The Real Estate Developer (who created 22 East 31st Street LLC, the owner of ROQO) did not want to exchange the rental apartment building for replacement property under § 1031.  As early as June 2007, Levine knew that the Real Estate Developer did not want to participate in a § 1031 exchange.

97.   On October 10, 2007, Anglo Capital acquired from 22 East 31st Street all of the shares of ROQO, for $5,280,000.  Levine represented 22 East 31st Street in connection with this stock purchase, and another law firm represented Anglo Capital.  Conn Vu executed the stock purchase agreement on behalf of Anglo Capital.  That same day, signature authority of ROQO under the ROQO 1031 agreement was transferred to Conn Vu as officer of Anglo Capital.

98.   In a letter dated October 10, 2007, 22 East 31st Street stated that all signatory authority for ROQO should be transferred to Conn Vu.

99.   After Anglo Capital acquired the ROQO shares, Levine returned to representing Anglo Capital in connection with this transaction.  Despite the fact that Conn Vu held signatory authority for ROQO, on November 9, 2007, Levine directed the holder of the 1031 exchange account to send all of the funds in the 1031 exchange account to Herrick Feinstein's escrow account.  In his instructions, Levine stated that "we have decided not to do a 1031 exchange[.]"

100.  On or around November 9, 2007, $5,711,779.38 was transferred from the 1031 exchange account to the Herrick Feinstein escrow account.  A portion of the profits from the ROQO transaction was transferred to the law firm that represented Anglo Capital in the stock purchase.  Specifically, on or around December 3, 2007, a transfer of $21,889.20 was made from the Herrick Feinstein escrow account to that law firm.  The remaining profit of $409,890.18 was left in the Herrick Feinstein escrow account.

101.  On its tax return for tax year 2007, Anglo Capital reported a capital gain of approximately $5,506,110 from the ROQO transaction, which was fully offset with bad debt losses reported by Anglo Capital.  Absent the preplanned elimination of the corporate tax on the gain from the sale of the rental apartment building in the ROQO transaction, there would be no economic benefit or business purpose in engaging in the intermediary transaction.

102.  The sale of ROQO's stock to Anglo Capital lacked economic substance or a business purpose and unlawfully allowed 22 East 31st Street to avoid paying corporate tax liabilities resulting from the gain on the sale of ROQO's rental apartment building.  Levine knew or should have known that the sale of ROQO's stock to Anglo Capital lacked economic substance and a business purpose.  Notwithstanding this knowledge, Levine promoted the ROQO transaction as an unlawful tax avoidance intermediary transaction at the expense of the United States Treasury.

*False Representations Contained in the Stock Purchase Agreement*

103.  The stock purchase agreement entered between 22 East 31st Street and Anglo Capital, which was negotiated on behalf of 22 East 31st Street by Levine, contained several material representations with respect to securing tax benefits that Levine knew or should have known were false.

104.  For example, the stock purchase agreement included the representation and warranty – made by both 22 East 31st Street and Anglo Capital – that the "execution, delivery, and performance" of the stock purchase agreement "does not and will not . . . require . . . mak[ing] any filing with, or notification to, any . . . Governmental Authority."  In fact, as Levine knew or should have known, the participants in this transaction were obligated to disclose the transaction to the IRS as a reportable transaction pursuant to IRS Notices 2001-16 and 2008-111.

105. The stock purchase agreement also included the false representation that no person or entity is entitled to any fee or commission in connection with the transaction "based upon arrangements made by or on behalf of" Anglo Capital. In fact, as described *supra* in paragraph 100, a portion of the profits from this transaction were retained in the Herrick Feinstein escrow account.

106. Similarly false was Anglo Capital's representation that it was acquiring ROQO's shares "for investment." Instead, as Levine knew or should have known, Anglo Capital did not intend to and did not in fact continue any business activities with respect to ROQO and did not invest in the ROQO shares. Rather, Anglo Capital purchased ROQO's shares for the purpose of (a) retaining a portion of the profits from ROQO's sale of the rental apartment building, and (b) offsetting the taxable gains from the transaction using bad debt.

107. Anglo Capital also represented in the stock purchase agreement that it would "pay all . . . Taxes of [ROQO] that are due." To the contrary, as Levine knew or should have known, Anglo Capital never intended to pay taxes to the IRS and in fact never paid taxes to the IRS; rather, it intended to and did purportedly eliminate taxes owed by unlawfully offsetting ROQO's gains with bad debt losses.

**<u>Other Intermediary Transactions Involving Anglo Capital</u>**

108. Using Anglo Capital, Levine also promoted, implemented, and/or participated in similar intermediary schemes involving the following target corporations: H.F. Allen Estate Co. on or about April 24, 2006; Sandbay Investments, Inc. on or about July 12, 2006; Triester Orange Realty Corporation on or about November 1, 2006; Technical Solutions of New York on or about December 20, 2006; 691 Eighth Avenue Corp. on or about August 9, 2007; and QQQ Corp./VMH Equities Corp. on or about December 24, 2008. In addition, again using Anglo

Capital, Levine also promoted, implemented, and/or participated in a tax avoidance scheme involving Queenswood Investments LLC ("Queenswood") on or about July 1, 2006, in which taxable income traceable to Queenswood was offset with purported bad debt deductions reported by Anglo Capital.

109.  With respect to each of the intermediary transactions and the Queenswood transaction listed and/or described *supra* in paragraphs 108, Levine assisted in gathering financial information for purposes of preparing and presenting Anglo Capital's tax returns.

110.  Each of the intermediary transactions listed and/or described *supra* in paragraphs 108 should have been disclosed by Levine to the IRS in response to the IRS's request pursuant to IRC § 6112, which was issued to him on or about February 14, 2012.  However, Levine failed to disclose the transactions involving H.F. Allen Estate Co. and Sandbay Investments, Inc.

111.  While Levine provided an incomplete response to the IRC § 6112 letter dated February 14, 2012, as described *infra* in paragraph 232 to 234, Levine failed to file with the IRS a return or statement that identifies or describes any of the intermediary transaction tax schemes that he organized and/or promoted using Anglo Capital.

**ILP Capital: Knatten Transaction**

112.  Beginning on or around December 2005, Levine promoted an unlawful intermediary tax transaction scheme using ILP Capital that was designed to offset gains from the sale of assets by Knatten Inc. ("Knatten").

113.  Knatten is a company that held appreciated real estate investments, including units in an umbrella partnership real estate investment trust, or UPREIT.  The UPREIT units held by Knatten were convertible into cash or shares of certain real estate investment trusts, or REITs.

114.  Attachez Pty ("Attachez") was the parent corporation of Knatten.  Attachez was owned by Siftco Pty ("Siftco").

115.  In or before 2005, the shareholders of Knatten contemplated selling its assets and/or its stock.  Graham Taylor initially acted on behalf of McNabola in connection with the anticipated transaction, but in light of his indictment on unrelated tax fraud in November 2005, Siftco insisted that Taylor not be involved.  As a result, McNabola brought Levine in to replace Taylor.  Levine represented First Active, and later ILP Capital, in connection with the Promoter Entities' contemplated involvement in the asset or stock purchase transactions.

116.  In or around December 2005, Levine prepared, on behalf of McNabola and First Active, a term sheet that contemplated the sale of the shares of Knatten's stock to First Active. An attorney for Siftco reviewed this term sheet and informed Levine that the transaction appeared very similar to a "midco transaction," another term for an intermediary transaction. The attorney for Siftco informed Levine that, because the transaction was very similar to a midco transaction, he could not recommend it to his client.  Around January 2006 Levine acknowledged that several midco companies were being audited but noted that the IRS has not "gone after the seller of the stock[.]"  This was false.  In fact, as Levine knew or should have known, the IRS was examining stock sellers engaged in similar transactions, as reflected in an IRS directive dated January 12, 2006, and entitled "Examination of Multiple Parties in Intermediary Transaction Tax Shelters as described in Notice 2001-16."

117.  Months later, the Knatten transaction resurfaced in a different form, in which ILP Capital was the purchaser of the stock and the company being acquired was Knatten's Australian parent Attachez.

118.  An attorney for Siftco asked Levine how ILP Capital planned to reduce the tax liabilities attributable to Knatten.  Levine falsely represented that he did not know how ILP Capital planned to reduce the tax liabilities, that he did not generally represent McNabola and that he did not intend to represent McNabola after this transaction.  Levine, whose law firm incorporated ILP Capital, knew that ILP Capital was controlled by McNabola.  Levine also knew or should have known that ILP Capital would be used, like the other Promoter Entities, to offset the tax liabilities with bad debt losses.

119.  The Knatten intermediary transaction was accomplished in four steps.  First, Knatten sold a number of partnership and membership interests in real estate companies.  Second, ILP Capital purchased the stock of Attachez, the parent corporation of Knatten.  Third, Knatten sold its remaining assets, including the UPREIT units.  Fourth, ILP Capital reported Knatten's capital gains on its income tax return, and offset these gains with its purported bad debt losses.

120.  In step one of the Knatten transaction, Knatten (while it was still owned by Attachez) sold a number of partnership and membership interests in companies (the "Equity Interests") to Trak Associates LLC ("Trak Associates") and VIC-GP LLC, which had the same beneficial owner as Knatten.  In the purchase and sale agreements dated October 12, 2006, these entities purchased the Equity Interests for over $30 million.  After selling the Equity Interests, the only assets held by Knatten were the UPREIT units and cash.

121.  In step two, ILP Capital acquired Attachez by entering into a stock share sale agreement with Siftco dated October 11, 2006.  Under the share sale agreement, ILP Capital purchased Siftco's stock in Attachez for $40,203,000.00, and also "loaned" $25,245,000 to Attachez, for a total of $65,448,000.

122. Levine represented ILP Capital in the stock purchase transaction. In the share sale agreement, Levine is named as the attorney to whom notices should be sent on behalf of ILP Capital.

123. Levine also handled arrangements for the financing received by ILP Capital for the stock purchase. Several lenders, including entities affiliated with McNabola and Forster, loaned approximately $63,348,000 to ILP Capital for the stock purchase.

124. After ILP Capital purchased the stock of Attachez, Knatten also converted its UPREIT units into marketable securities, and then sold the marketable securities. The cash received by Knatten from the sale of the UPREIT units and Equity Interests was transferred into a Herrick Feinstein escrow account.

125. Levine's involvement with ILP Capital changed around the time of the stock purchase. Effective September 26, 2006, Levine became one of two signatories to one of Knatten's bank accounts. Levine was also appointed as the Vice President of Knatten, effective October 13, 2006.

126. Money received from the sale of Knatten's assets was used to repay the loans secured by ILP Capital to purchase the stock of Attachez. The profits from the Knatten transaction – approximately $13,588,480.48 – were then distributed to various law firms and entities, including but not limited to Herrick Feinstein ($400,000), King Louie Enterprises ($150,000), and entities affiliated with McNabola ($4,173,700).

127. Knatten filed a tax return for tax year 2006, in which it stated that Attachez merged into Knatten. The tax return stated that the merger "constitutes a reverse acquisition and merger under IRC Section 368(a)(1)(B) and Reg Section 1.1502-75(d)(3)," and that "[a]ccordingly, this

consolidated return is filed under Reg Section 1.1502-75(d)(3) with Knatten Inc. . . . continuing

as the reporting parent and ILP Capital Inc. . . . included as a subsidiary."

128.  On its tax return for tax year 2006, Knatten reported the taxable gains generated from

its sale of the Equity Interests and the gains generated from the sale of the UPREIT units.

Knatten offset these gains with bad debt deductions from ILP Capital.

129.  The sale of Attachez's stock to ILP Capital lacked economic substance or a business

purpose and unlawfully allowed Knatten to avoid paying corporate tax liabilities resulting from

the gain on the sale of the Equity Interests and the UPREIT units.  Levine knew or should have

known that the sale of Attachez's stock to ILP Capital lacked economic substance and had no

business purpose.  Notwithstanding this knowledge, Levine promoted the Knatten transaction to

Attachez as an unlawful intermediary transaction to avoid paying taxes upon the sale of

Knatten's assets.  Without this transaction, Knatten would incur a tax liability of over $53

million resulting from the sale of its assets.  Instead, Levine promoted and assisted in the

execution of a transaction to avoid payment of those taxes, and received a portion of the profits,

*i.e.*, the tax savings, which was divided amongst his firm and other individuals and entities

involved in the transaction.

130.  Levine failed to file with the IRS a return or statement that identifies or describes any

portion of the Knatten intermediary transaction tax scheme that he organized and/or promoted.

Notably, Levine failed to do so notwithstanding being advised by Siftco's counsel that it would

file a protective disclosure in light of the possibility that the IRS would determine that the

Knatten transaction was substantially similar to an intermediary transaction.

## DEFENDANT'S STATE TAX CREDIT TRANSACTIONS

131. State low income housing tax credits ("LIH tax credits") and state historic tax credits ("historic tax credits") are state tax credits earned by real estate project owners who are rehabilitating qualified property. *See, e.g.*, Mo. Ann. Stat. §§ 135.352, 253.550; Iowa Code § 404A.2. The tax credits may be sold or transferred to other persons and/or entities in order to raise money for the real estate construction projects. *See, e.g.*, Mo. Ann. Stat. §§ 135.363, 253.557; Iowa Code § 404A.4(5).

132. Between 2005 and 2011, Levine unlawfully promoted three types of abusive tax shelter transactions involving LIH tax credits and historic tax credits. These schemes are abusive transactions, and were designed to enable real estate project owners to evade taxes arising from the sale of these state tax credits to third-party purchasers, thus enhancing the value of their tax credits to the real estate developer. Levine perpetrated the scheme using corporations controlled by McNabola, including First Active, AIB Capital, Anglo Capital, and BOI Capital, and in turn Levine and the Promoter Entities garnered a profit. Altogether, Levine and the Promoter Entities participated in approximately 75 abusive state tax credit transactions, which garnered Levine fees of approximately $1,755,410.

133. Attached as Exhibit A is a list of the 75 abusive state tax credit transactions in which Levine and the Promoter Entities participated, including the name of the promoter entity involved in each abusive transaction, the name of the entity that held or received the state tax credits and the approximate date on which the abusive transaction commenced.

**<u>The Loss Partner Scheme</u>**

134. In one type of scheme promoted by Levine, the Promoter Entities Agate and then AIB Capital served as the "loss partner" for real estate projects utilizing LIH tax credits or historic tax

credits (the "loss partner scheme" or "loss partner transaction") to fund property development. Many of these real estate projects occurred in Missouri. Levine represented Agate and AIB Capital, while another law firm often represented the real estate project developer.

135. Typically, in this scheme, prior to the real estate project's sale of LIH tax credits or historic tax credits, the promoter firm entered into a structure whereby it became a 99%-plus member of a specially-created LLC in exchange for a capital contribution of $1,000.00. This entity was typically referred to as a "state member" entity. It held an indirect interest in the real estate project owner, and its purposes included receiving, allocating, and distributing tax credits, and selling or transferring tax credits.

136. Tax credits were sold following the establishment of the promoter firm's specially-created LLC. The income from the sale of these credits was allocated to this entity.

137. Next, the promoter firm would report the income and use losses from either DAD, such as the Chinese bad debt, or DAT to offset the income. This increased the value of the tax credits for the real estate project owner, as virtually all the income derived from the sale of those tax credits was sheltered.

138. The promoter firm would then exit the specially-created partnership structure, never intending to retain its interest in the real estate project for investment purposes. In exchange for its participation in the transaction, the promoter firm would receive a fee, which was calculated as a percentage of the amount of gain to be sheltered. Usually the promoter firm would obtain approximately 8 to 9% of the gains sheltered. Levine generally took 20% of Agate's fee, via his company, LL Real Estate.

139. Typically, the profits resulting from the loss partner transactions were distributed to Agate through Herrick Feinstein's escrow account. Levine would forward the entire amount

from the Herrick Feinstein escrow account to Agate at a bank account in California, under the control of Tim Conn Vu, another First Active associate and promoter.  Once Agate received the monies, 20% of it was then sent to LL Real Estate for the benefit of Levine.  Conn Vu prepared invoices from LL Real Estate to Agate for those payments.

140.  Between 2005 and 2011, the Promoter Entities participated in approximately 44 loss partner transactions resulting in profits of about $6.5 million, of which Levine received about $1.3 million.

141.  Levine initially ran the loss partner schemes using Agate, which was formed on March 15, 2000, in Delaware by Fred Forster, the co-founder of Fortrend International LLC. Fortrend was a promoter firm that completed approximately one hundred intermediary transactions in the 1990s through 2003.  The Millenium Recovery Fund, an entity controlled by McNabola, was listed as the sole member of Agate on Agate's tax returns between 2003 and 2005.  On August 19, 2005, the Millenium Recovery Fund sold its interest in Agate to First Active for $10.  From that point forward, all of Agate's income and losses were reported on First Active's returns.  Agate was transferred to First Active because the Millenium Recovery Fund had run out of bad debt losses to offset taxable income, and First Active still had such losses that it planned to claim on its return.

142.  After being sold to First Active, Agate participated in approximately 42 loss partner transactions, all of which were arranged by Levine.

143.  Each of Agate's 42 loss partner transactions were structured similarly to the "411 State Member Transaction," described immediately below.  (*See infra* ¶¶ 144-153).

144. The 411 State Member transaction involved the sale of Missouri historic tax credits earned in connection with the rehabilitation of several properties located in St. Louis, Missouri (the "St. Louis properties").

145. The key players in this loss partner transaction include:

a. 411 Landlord, LLC (the "411 Landlord" or the "Project Entity"). 411 Landlord owned the St. Louis properties.

b. The real estate project manager (the "Project Manager").

c. 411 State Member, LLC ("411 State Member"). 411 State Member was an entity formed on September 8, 2008, for purposes of the loss partner investment. The Project Manager, the managing member, contributed capital of $100 for a .01% interest in 411 State Member. Agate, the investment member, contributed $1,000 for a 99.99% interest in 411 State Member.

d. Agate. Agate functioned as the "loss partner." Levine represented Agate in connection with the 411 State Member transaction (as well as the other 41 loss partner transactions using Agate as the "loss partner").

146. Several documents set forth the structure of the 411 State Member transaction, including (but not limited to) the Operating Agreement of 411 State Member (the "411 Operating Agreement"), the letter agreement concerning the sale of Missouri historic preservation tax credits and other matters (the "Side Letter Agreement"), and the Purchase Option Agreement concerning 411 State Member (the "Purchase Option Agreement").

147. <u>The 411 Operating Agreement</u>. In December 2008, the Project Manager and Agate entered into the 411 Operating Agreement, which provided, among other things, for 411 State Member to receive, allocate, and distribute net proceeds from the sale of the Missouri tax credits.

Specifically, among other things, the 411 Operating Agreement confirms that, pursuant to the applicable Project Entity Agreement, 100% of the Missouri historic tax credits were allocated to 411 State Member, with the proceeds from the sale of the Missouri tax credits allocated to its members. Thus, 99.99% of the gain from the sale of the Missouri tax credits was allocated to Agate.

148. The Side Letter Agreement. On or about the same day the 411 Operating Agreement was entered, 411 State Member and Agate also entered the Side Letter Agreement. The Side Letter Agreement specified the fees and transaction costs to be paid by 411 State Member from the proceeds of the Missouri tax credit sales. Pursuant to the Side Letter Agreement, upon admission of Agate into 411 State Member, 411 State Member agreed to pay $5,000 in attorney's fees to Herrick Feinstein with the following paid to Agate:

a. 8.75% of the gain from the sale, to be paid within 10 days of receipt of the Missouri tax credit sales proceeds;

b. 8.75% of any other taxable income of 411 State Member that is allocated to Agate, to be paid within the earlier of several specified time periods.

149. The Purchase Option Agreement. Finally, also on or around the same date that the 411 Operating Agreement and Side Letter Agreement were entered, 411 State Member and Agate entered into the Purchase Option Agreement. Pursuant to this agreement, Agate granted an option to the Project Manager to purchase Agate's member interest in 411 State Member for fair market value plus the amount of any fees due to Agate. The term of the option began on January 1, 2011 – approximately two years following execution of the Purchase Option Agreement – and expired in June, 2013.

150. The law firm that served as special counsel to 411 State Member in this transaction learned about Agate from Levine. Typically, when that law firm found a real estate developer, such as 411 Landlord, in need of a "loss partner," it contacted Levine to ask if Agate was interested in the particular project.

151. Levine, in turn, negotiated the loss partner transactions, including the 411 State Member transaction, on behalf of Agate and provided the terms and approval for Agate to enter the deals as the "loss partner."

152. The 411 State Member transaction was expected to generate approximately $2.3 million of reportable income for Agate from the sale of the Missouri tax credits, which were sold in 2009.

153. Typically, First Active, as Agate's owner, would report the income that Agate earned as a member of the specially-created state member entity, as reported on the K-1 forms that it received. It would then completely offset that income using the Chinese bad debt. However, it does not appear that First Active reported income earned by Agate with respect to the 411 State Member transaction on its federal tax returns.

Levine Substitutes AIB Capital for Agate as the "Loss Partner" in State Credit Transactions Because First Active Runs Out of Losses

154. In late 2009, Levine began substituting and using AIB Capital instead of Agate as the "loss partner" in the loss partner transactions. Levine switched to using AIB Capital as the "loss partner" because First Active was out of losses. In addition, the State of New York opened an examination of First Active, Agate's parent, in June, 2009, and McNabola was concerned that the IRS would soon follow suit.