155.  The loss partner transactions involving AIB Capital as the loss partner were structured similarly to the Agate loss partner transactions.  AIB Capital participated in approximately ten loss partner transactions, eight of which originated with Agate.

156.  The money flow for the AIB Capital loss partner transactions worked similarly to the Agate loss partner transactions.  AIB Capital's fee for serving as a loss partner would be paid to Herrick Feinstein's escrow account, and Levine would then forward the entire amount to a bank account in California, under Conn Vu's control.  Once the fee was received by AIB Capital, approximately 20% was sent to LL Real Estate for the benefit of Levine.

157.  Between 2010 and 2011, AIB Capital generated profits of more than $1.1 million for participating in the loss partner scheme.  Levine received $116,000 of this amount.

Loss Partner Scheme:  False Statements

158.  The transactional documents negotiated and approved by Levine in connection with the 411 State Member transaction and other loss partner schemes utilizing Agate and AIB Capital included a number of material statements with respect to securing a tax benefit that Levine knew or had reason to know were false.

159.  For example, typically, the operating agreements for the loss partner schemes included a representation and warranty that the promoter entity – Agate or AIB Capital – was acquiring its interest in the state member "for its own account and for investment only and not for the purpose of, or with a view to, the resale or distribution of all or any part thereof, nor with a view to selling or otherwise distributing said interests or any part thereof at any particular time or under any predetermined circumstances."  In fact, as Levine knew or should have known, at the time Agate and AIB Capital entered into these operating agreements, it was known that the membership interests acquired by them would be sold back – for a nominal amount – to the real

estate developer or its affiliated entities after the tax credit recapture period expired.  Neither Agate nor AIB Capital ever intended to hold the interests as an investment.

160.  In addition, both Agate and AIB Capital represented and warranted that they had "total assets in excess of $5,000,000" and that their investment constituted "less than 10%" of their net worth.  In fact, these promoter entities were thinly capitalized, and any cash they received was distributed to the promoters or their associates.  The majority of assets reflected on their balance sheets were investments in the state member entities, which they later sold back for nominal amounts.

161.  Levine also made material false representations to business associates.  For example, in mid-2007 Levine falsely represented to the law firm representing the real estate developer in the loss partner transactions that Agate was conducting ongoing business operations and had very substantial assets.

**The Corporate Acquisition Scheme**

162.  The second type of tax credit scheme promoted by Levine involved corporations that owned LIH tax credits and that were acquired by Missouri real estate developers or their companies (the "Missouri Real Estate Developers").  The Missouri Real Estate Developers met with Levine in or around 2007 at a business meeting, in which they discussed a new business structure involving the sale of state tax credits.

163.  In this second type of tax credit scheme, BOI, which served as the promoter entity in these transactions, acquired the corporations holding the LIH tax credits through a series of stock purchase and merger transactions (the "corporate acquisition scheme").  Levine represented the promoter firm BOI in connection with these transactions.

40

164.  In the first step of this corporate acquisition scheme, BOI acquired the stock of the corporations in exchange for promissory notes.  These acquired corporations are partners in lower tiered partnership entities that generate LIH tax credits.  Based on collateral pledges and limited partnership agreements between the acquired corporation and the lower tier entity, BOI was allocated 100% of the state tax credits.

165.  Next, BOI claimed on its tax returns that the newly acquired corporations were merged into BOI pursuant to IRC § 368(a)(1)(C).

166.  After the purported mergers, BOI sold the LIH tax credits to third parties.  To accomplish this, BOI entered into a remarketing agreement with an entity owned by the Missouri Real Estate Developers, under which the entity provided remarketing services relating to the LIH tax credits and acted as BOI's agent to identify purchasers of the tax credits.

167.  BOI reported the gain from the sale of the LIH tax credits on its 2008 income tax return.  BOI used bad debt losses to offset the gains from the sale of the LIH tax credits.  Even though BOI sold state tax credits during the taxable years 2009 and 2010, no sales of state tax credits were reported on either return.

168.  The proceeds from the sale of the LIH tax credit were transferred to an escrow account with a law firm, for distribution under the direction of the original shareholders.  A portion of the proceeds from the sale of the LIH tax credits was used to repay the promissory note to the original shareholders.  A portion of the sale proceeds was distributed to the remarketing agents (the Missouri Real Estate Developers) and to the law firm holding the escrow account, for accounting and legal services.  A portion of the sale proceeds was also transferred to a bank to repay loans for the underlying real estate project.

169. The net remaining proceeds, which equaled approximately six percent of the proceeds from the sale of the LIH tax credits, were transferred to the Herrick Feinstein escrow account under Levine's control.  Levine then distributed the fees to the participants in the transaction, including fees to King Louie in the amount of $378,238.

170. Between 2008 and 2010, the Promoter Entities participated in approximately 30 corporate acquisition schemes and Levine earned fees totaling approximately $378,238.

171. One example of a corporate acquisition scheme is the SCS II Fund transaction, which involved the sale of Missouri LIH tax credits generated from the rehabilitation of low-income housing projects in Missouri (the "Missouri projects").

172.    The key players in this scheme included:

a.    Brookfield Village Apartments LP ("Brookfield").  Brookfield owned, operated and/or developed the Missouri projects that received LIH tax credits.

b.    State Credit Syndicators II, LLC ("State Credit Syndicators").  State Credit Syndicators held a 0.01 percent limited partner interest in Brookfield.

c.    LIHTC Partners, LLC ("LIHTC Partners").  LIHTC Partners owned a 99.94 percent interest in State Credit Syndicators.

d.    SCS II Fund.  SCS Fund II was formed in January 2008.

e.    BOI.  BOI served as the promoter entity.

f.    The Missouri Real Estate Developers.  The Missouri Real Estate Developers served as the real estate investors.  As of around December 31, 2007, the Missouri Real Estate Developers owned 100% interest in LIHTC Partners.  Beginning in January 2008, they both also served as directors and officers of SCS II Fund.

173. The SCS II Fund transaction primarily involved four steps.

42

174.  First, in January 2008, LIHTC Partners transferred its interest in State Credit Syndicators to SCS II Fund, pursuant to 26 U.S.C. § 351.  Under section 351, a transferor (such as LIHTC Partners) can transfer property (such as its interest in State Credit Syndicators) to a corporation in exchange for stock in that corporation.  Thus, immediately upon the transfer of its interest in State Credit Syndicators to SCS II Fund, LIHTC Partners obtained stock sufficient to give it a controlling interest in SCS II Fund.

175.  Second, on or around February 13, 2008, BOI purchased the stock of SCS II Fund from LIHTC Partners in exchange for a promissory note in the amount of $1,085,000.  Effective February 13, 2008, the Missouri Real Estate Developers resigned as directors and officers of SCS II Fund.

176.  Levine represented BOI in connection with the stock purchase agreement.  The stock purchase agreement states that all notices should be sent to Timothy Conn Vu as President of BOI, with a copy to Harold Levine of Herrick Feinstein.

177.  The stock purchase agreement represented, falsely, that BOI was acquiring the stock of SCS II Fund "for investment."  The stock purchase agreement also falsely represented that no person was entitled to any fee or commission in connection with the transaction contemplated in the stock purchase agreement.

178.  The stock purchase agreement also provided, falsely, that BOI agreed to cause SCS II Fund "to prepare and file on a timely basis all federal, state and local tax returns of SCS II Fund for periods commencing on and after the Closing Date, and to pay all federal, state and local Taxes of SCS II Fund that are due."

179.  In the third step of the transaction, as set forth in BOI's tax return for tax year 2008, SCS II Fund was merged into BOI purportedly pursuant to IRC § 368(a)(1)(C).  As a result of

the merger, the LIH tax credits held by SCS II Fund, which were to be allocated to SCS II Fund, were allocated to BOI.

180.   Fourth, in 2008, BOI sold the LIH tax credits to third parties.  The Missouri Real Estate Developers arranged these sales.  BOI reported on its tax return for tax year 2008 the income from the sale of the LIH tax credits ($218,583.95), and used bad debt losses to offset this income.

181.   BOI received in 2009 approximately $44,000 in income from LIH tax credits sold in 2008.  However, BOI did not report on its tax return for tax year 2009 any of the income it received from the sale of LIH tax credits.

182.   The proceeds received by BOI for the sale of the LIH tax credits were allocated among the parties involved in the transaction.  Approximately $12,036.59 was allocated to BOI, and approximately $66,642.91 was allocated to LIHTC Partners.

183.   On or around January 1, 2011, BOI sold its interest in State Credit Syndicators to LIHTC Partners.

**The Refundable Credit Scheme**

184.   Levine also promoted a third type of state credit transaction, which involved refundable state tax credits (the "refundable credit scheme").  Anglo Capital served as the Promoter Corporation.  Levine represented Anglo Capital in the refundable credit scheme.

185.   The refundable credit scheme involved State of Iowa refundable historic tax credits held by Kirkwood Commons, LLC ("Kirkwood").  The Missouri Real Estate Developers were the real estate investors in Kirkwood.  The Missouri Real Estate Developers formed SCS Iowa and transferred ownership interest in the project to SCS Iowa, resulting in SCS Iowa holding a 99.99% interest in Kirkwood.

186. In the first step of the refundable credit scheme, SCS Iowa filed a corporate tax return with the State of Iowa for fiscal year ending October 31, 2007, in which it requested a refund of the refundable historic tax credits in the amount of approximately $2,380,608. Pursuant to Kirkwood's second amended operating agreement, SCS Iowa was required to use $1.8 million of the refund to make a capital contribution to Kirkwood, to repay a bank loan. Pursuant to the Escrow Agreement, the tax refund was sent directly to the bank, and SCS Iowa received the cash remaining after repayment of the bank loan, approximately $580,608. This cash was combined with $1,000 in capital and was later transferred into Herrick Feinstein's escrow account for the benefit of Anglo Capital.

187. In the second step of the refundable credit scheme, Anglo Capital acquired the stock of SCS Iowa for $25,000. Two days later, SCS Iowa was merged into Anglo Capital. The purpose of these two transactions was to allow Anglo Capital to absorb the income generated from the refundable historic tax credit refund. The business activities of SCS Iowa were not continued after its merger with Anglo Capital.

188. In the third step of the refundable credit scheme, Anglo Capital reported SCS Iowa's income on its tax return for tax year 2007. However, Anglo Capital incorrectly reported only $581,608 as income attributable to SCS Iowa's receipt of the refund for its refundable historic tax credits. Anglo Capital did not report the remaining $1.8 million that was refunded to SCS Iowa and used to repay the bank loan. Anglo Capital then offset all of SCS Iowa's reported income using bad debt losses.

189. The stock purchase agreement between Anglo Capital and SCS Iowa acknowledges that SCS Iowa has not made any estimated tax payments, that SCS Iowa will receive a tax refund of $2,380,608, and that the refund "shall create a tax liability for the tax year beginning

November 1, 2007." However, as set forth *supra* in paragraph 188, Anglo Capital did not report on its return the entire refund received by SCS Iowa.

190. Approximately $345,000 of the approximately $581,608 cash received by Anglo Capital was returned to the Missouri Real Estate Developers. The remaining net profit – approximately $211,608 – was left in Herrick Feinstein's escrow accounts and commingled with other funds held for Anglo Capital.

## DEFENDANT'S TAX SCHEMES ARE UNLAWFUL

191. Paragraphs 1 to 190 are realleged and incorporated herein.

192. The tax schemes described herein in paragraphs 30 to 190 constitute illegal tax arrangements under at least four separate judicial doctrines: (1) the substance-over-form doctrine; (2) the doctrine of economic substance; (4) the sham transaction doctrine; and (4) the step-transaction doctrine.

193. In addition, the tax schemes described herein in paragraphs 30 to 190 violate a number of provisions of the Internal Revenue Code, including but not limited to IRC §§ 269, 482 and 165.

## INJUNCTION UNDER IRC § 7408

194. Paragraphs 1 to 193 are realleged and incorporated herein.

195. IRC § 7408(a) authorizes a district court to, *inter alia*, enjoin persons and entities who have engaged in conduct subject to penalty under IRC §§ 6700, 6707, or 6708. As further described herein, Levine has engaged in conduct prohibited by IRC §§ 6700, 6707, and 6708.

### A.   26 U.S.C. § 6700

196. IRC § 6700 imposes a civil penalty on any person who (1) either organizes or assists in the organization of a plan or arrangement or participates in the sale of any interest in a plan or

arrangement; and (2) makes or furnishes, or causes another to make or furnish, in connection with such organization or sale, a statement with respect to the securing of a tax benefit by reason of holding an interest in an entity or participating in the plan or arrangement that the person knows or has reason to know is false or fraudulent as to any material matter.

197.  Levine violated IRC § 6700 by organizing, promoting and participating in plans or arrangements (the intermediary transaction, state tax credit transaction, and other tax avoidance schemes), and by making or furnishing, or causing others to make or furnish, false or fraudulent statements with respect to those schemes' purported tax benefits, which were material and which Levine knew or had reason to know were false or fraudulent.

**(1)   Levine's tax schemes are plans or arrangements**

198.  Any plan or arrangement "having some connection to taxes" falls under IRC § 6700.

199.  The intermediary transaction, state tax credit transaction and other tax avoidance schemes were executed to avoid the payment of taxes on gains or income generated by the target entity.  Accordingly, these tax schemes are plans or arrangements within the meaning of IRC § 6700.

**(2)   Levine organized and/or assisted in the organization of intermediary transaction tax schemes, state tax credit transaction tax schemes, and other tax avoidance schemes**

200.  Levine organized, or assisted in the organization of, the intermediary transaction, state tax credit transaction and other tax avoidance schemes.

201.  Levine's organization of the schemes included, *inter alia*, (a) Levine's introduction of clients to the Promoter Entities to participate in certain intermediary transaction tax shelters; (b) Levine's proposing state tax credit transaction tax shelter structures to potential participants in the schemes; (c) Levine's service as an officer for at least two of the Promoter Entities during the

execution of certain intermediary transaction tax shelters; (d) Levine's use of the escrow accounts of Herrick Feinstein to hold and distribute funds relating to the tax shelter transactions; (e) Levine's representation of the selling shareholder or the Promoter Entities in connection with the promoter entity's purchase of the target corporation's stock in the intermediary transaction tax shelters; (f) Levine's participation in the negotiations of the stock purchase agreements in certain intermediary transaction tax shelters; (g) Levine's use of Queenswood Investments LLC ("Queenswood") to acquire partnership units in One CityPlace LP ("One CityPlace") for himself and his business partners as part of a tax avoidance scheme; and (h) Levine's representation of the Promoter Entities in connection with their participation in the state tax credit transaction tax shelters and other tax avoidance schemes.

     **(3)**   **Levine participated in the sale of an interest in the intermediary transaction tax schemes, state tax credit transaction tax schemes, and other tax-avoidance schemes**

202.  Levine participated in the sale of an interest in the transactions central to the intermediary transaction, state tax credit transaction, and other tax-avoidance schemes.

203.  Levine's participation included, *inter alia*, (a) Levine's representation of the Promoter Entities or the target corporations in the intermediary transaction tax schemes; (b) Levine's representation of the Promoter Entities in the state tax credit transaction tax schemes; (c) Levine's participation in the negotiations of the stock purchase price in at least one intermediary transaction tax shelters; (d) Levine's service as an officer for at least two of the Promoter Entities during the execution of certain intermediary transaction tax shelters; (e) Levine's use of Queenswood to acquire partnership units in One CityPlace for himself and his business partners as part of a tax avoidance scheme; (f) Levine's approval of the Herrick Feinstein opinion letter regarding whether a transaction was reportable as an intermediary transaction; and (g) Levine's

facilitation of the target corporation's use of the Promoter Entities in the intermediary transaction tax schemes and the state tax credit transaction tax schemes.

### (4) Levine made or furnished, or caused others to make or furnish, false or fraudulent statements with respect to the securing of tax benefits

204. Through his representation of the selling shareholder or the Promoter Entities in each of the intermediary transactions and state tax credit transactions identified in this complaint, Levine made false statements with respect to tax benefits and caused the parties to make false statements in the stock purchase agreements and operating agreements with respect to tax benefits.

205. These false statements included, *inter alia*, that (a) the parties to the agreements need not make any filing with, or notification to, any government entity regarding the performance of the stock purchase agreement; (b) the Promoter Entities were acquiring the shares for investment purposes; (c) no person would be entitled to a fee or commission in connection with the transaction; and (d) the Promoter Entities would cause the target corporation to pay all of its federal, state and local taxes that were due.

206. Levine also made false statements to owners and shareholders of the target corporations involved in the intermediary transactions and the entities involved in the state tax credit transactions. These false statements included, *inter alia*, representations regarding (a) the validity of the Promoter Entities' reported losses; (b) the legitimacy of the Promoter Entities' business purpose; (c) the amount or significance of the Promoter Entities' assets; (d) Levine's work history with McNabola; (e) Levine's knowledge of the means by which the Promoter Entities would handle the capital gains taxes generated by the target corporation's asset sale; (f) whether a particular transaction constituted a "reportable" transaction subject to disclosure to the IRS; and (g) the IRS's enforcement efforts.

49

207. Levine also caused certain entities, namely PAF, ROQO, and 691 Eighth Avenue Corp., to enter into 1031 agreements in which they falsely represented their intent to engage in a like-kind exchange of real estate property pursuant to IRC § 1031. However, as was known from the outset, the proceeds from the asset sale were not used to purchase like-kind property, were never intended to be used to purchase like-kind property, and ultimately were distributed to a Herrick Feinstein escrow account.

208. In addition, with respect to the tax avoidance scheme involving Queenswood, in an attempt to acquire additional units for Queenswood's investment, Levine approved material sent to owners of partnership units in One CityPlace which falsely stated that Queenswood had net operating losses available to legally offset income from the partnership.

### (5)   Levine knew or had reason to know that the statements were false or fraudulent

209. Levine knew or had reason to know that the statements he made in connection with his intermediary transaction and state tax credit transaction tax schemes were false or fraudulent, for numerous reasons.

210. First, Levine knew or had reason to know that statements he made or caused others to make in connection with his tax schemes were false or fraudulent based on his education and experience.

211. Levine, an experienced tax attorney, was familiar with Notices 2001-16 and 2008-111, and therefore knew or should have known that the intermediary transaction tax schemes were the same as or superficially disguised to avoid resemblance to the listed transactions described in those Notices.

212. In the past, Levine has represented at least one client that was involved in an IRS examination concerning an intermediary transaction. Through his representation of this client,

Levine was or should have been aware of the listed transactions described in Notice 2001-16 and 2008-111. Therefore, Levine knew or should have known that intermediary transaction tax schemes may be viewed by the IRS as substantially similar to the listed transactions described in Notice 2001-16 and 2008-111.

213. Second, Levine knew or had reason to know that statements he made or caused others to make in connection with his intermediary transaction tax schemes were false because he approved the Herrick Feinstein opinion letter, which concluded that the PAF transaction did not constitute an intermediary transaction tax shelter because the parties planned to enter into a like-kind exchange transaction. Levine knew that the like-kind exchange was a fiction. Levine also knew, at a minimum, that his participation in similar intermediary transactions that did not include a like-kind exchange transaction constituted unlawful intermediary transaction tax shelters that should have been disclosed pursuant to the Treasury Regulations and the Internal Revenue Code.

214. Third, Levine knew or had reason to know that statements he made or caused others to make in connection with the intermediary transactions and certain state tax credit transactions were false because he worked with McNabola and Forster on a number of transactions involving First Active, Anglo Capital, BOI Capital and ILP Capital involving the acquisition of corporations for non-investment purposes. In the intermediary and state tax credit transactions, the assets of the acquired corporation were sold prior to or immediately after the stock purchase, the corporation was merged into one of the Promoter Entities, and in the case of BOI, were sold back to the original shareholders after purportedly being merged into BOI.

215. Fourth, Levine knew or had reason to know that statements he made or caused others to make in connection with the intermediary transaction and state tax credit transaction tax

schemes were false because he knew or should have known that the Promoter Entities were thinly capitalized.  Levine knew or should have known that the Promoter Entities were thinly capitalized because the funds for the transactions flowed through his law firm's escrow account. Levine also knew or should have known that the Promoter Entities were not on-going businesses and did not have legitimate losses.

216.  Fifth, Levine knew or had reason to know that statements he made or caused others to make in connection with the intermediary transaction and state tax credit transaction tax schemes were false because he knew or should have known that fees or commissions were paid in connection with the transactions.  Levine approved the transfer of fees and commissions to Herrick Feinstein and to entities owned by Levine and/or Katz, McNabola, and others.  The fees and commissions were paid from the escrow accounts of Levine's law firm, Herrick Feinstein.

217.  Sixth, Levine knew or had reason to know that statements he made or caused others to make in connection with the intermediary transaction and state tax credit transaction tax schemes were false because he knew or should have known that the Promoter Entities intended to avoid payment of capital gains taxes and income taxes due from the corporations they acquired or partnered with.  Levine received reports and emails showing that McNabola, using trusts and partnerships, acquired foreign debt that was reported on the Promoter Entities' tax returns as deductions to offset the income and gains reported on the Promoter Entities' tax returns.  Levine also knew or should have known from these reports and emails that the debts were acquired not for a business purpose, but were acquired for the purpose of giving the Promoter Entities deductions to report on their tax returns.  For example, Levine made statements to at least one shareholder of a target corporation indicating that the Promoter Entities used losses or assets with high basis and low value.  In addition, as head of the Tax Group at

Herrick Feinstein, Levine knew or should have known about news releases from the IRS pertaining to DAD and DAT transactions.  Combined with his past experience with Fortrend and McNabola, Levine knew or should have known that the debts used by the Promoter Entities should and would be disallowed by the IRS.

218.   Seventh, Levine knew or had reason to know that statements he made or caused others to make in connection with the intermediary transaction tax schemes were false because he knew or should have known that the 1031 agreements would be cancelled at a later date. Levine knew or should have known that the target corporations he purportedly represented were not interested in entering into a like-kind exchange of real estate pursuant to IRC § 1031.  Levine also knew or should have known that the cancellation of the 1031 agreements would result in the generation of a material amount of capital gains and income that would be offset by bad debt losses.

### (6)   Levine's false statements were material

219.   If a particular statement has a substantial impact on the decision-making process or produces a substantial tax benefit to a taxpayer, the matter is properly regarded as "material" within the meaning of IRC § 6700.

220.   The intermediary transaction, state tax credit transaction, and other tax avoidance schemes produced substantial tax benefits for the Promoter Entities and Levine's clients, as well as significant benefits for Levine personally.

221.   The false statements in Levine's transactional documents and Opinion Letter were material because they substantially impacted the decision-making process and produced a substantial tax benefit to the target corporations and the Promoter Entities.  The tax shelters were executed through transactional documents – including but not limited to the stock purchase

agreements, the 1031 agreements, and the operating agreements – that contained false statements

regarding important elements of the transaction including the purpose of the transactions, the

fees paid as part of the transactions and the Promoter Entities' intent to comply with their tax

obligations.

222.   The false statements made by Levine to the shareholders and/or principals and agents

of the target corporations were material because they had a substantial impact on the target

corporations' decision-making process.

**B.**   **26 U.S.C. § 6707**

223.   IRC § 6707 penalizes any person who is a material advisor and either (1) fails to file

with the IRS a return or statement that identifies and describes any reportable or listed

transaction, any potential tax benefits expected to result from that transaction, and any other

information required by statute if that person is required to file this information with the IRS, or

(2) files false or incomplete information with the IRS with respect to such transaction.

224.   A material advisor is defined in IRC § 6111(b)(1)(A) as "any person (i) who provides

any material aid, assistance, or advice with respect to organizing, managing, promoting, selling,

implementing, insuring, or carrying out any reportable transaction, and (ii) who directly or

indirectly derives gross income in excess of the threshold amount (or such other amount as may

be prescribed by the Secretary) for such aid, assistance, or advice."

225.   A reportable transaction is defined in IRC § 6707A(c)(1) as "any transaction with

respect to which information is required to be included with a return or statement because, as

determined under regulations prescribed under section 6011, such transaction is of a type which

the Secretary determines as having a potential for tax avoidance or evasion."

226. A listed transaction is defined in IRC § 6707A(c)(2) as "a reportable transaction which is the same as, or substantially similar to, a transaction specifically identified by the Secretary of the Department of Treasury as a tax avoidance transaction for purposes of section 6011."

227. The "threshold amount" is defined in IRC § 6111(b)(1)(B) as "$50,000 in the case of a reportable transaction substantially all of the tax benefits from which are provided to natural persons, and . . . $250,000 in any other case."

228. Levine is a material advisor because he provided assistance for, participated in, organized and/or promoted the execution of the intermediary transaction tax schemes using the Promoter Entities, and received fees totaling over $3.3 million for his assistance and participation in these tax schemes.

229. The intermediary transaction tax schemes constitute listed and reportable transactions because, as set forth in Notices 2001-16 and 2008-111, these transactions have been identified as tax avoidance transactions.

230. Levine failed to file with the IRS a return or statement that identifies or describes any of the reportable or listed transactions that he has organized and/or promoted. At all relevant times, Levine was required to provide to the IRS the information required under IRC § 6111. Accordingly, Levine has engaged in conduct subject to penalty under IRC § 6707, and should be enjoined from engaging in any further conduct that violates IRC § 6707.

**C.   26 U.S.C. § 6708**

231. IRC § 6708 penalizes any person who fails to furnish to the IRS within 20 business days of a request a list that identifies all taxpayers for whom that person served as a material advisor concerning any reportable transaction, including any listed transaction.

232. On February 12, 2012, the IRS issued to Levine a Request for Production Under Internal Revenue Code Section 6112 (the "6112 letter"). In the 6112 letter, the IRS stated that it identified Levine as a material advisor obligated to maintain a list or lists under IRC § 6112, and requested that Levine produce, within 20 business days, such list and all other required information that he is obligated to maintain under IRC § 6112.

233. In a letter dated February 29, 2012, Levine responded to the 6112 letter and enclosed a "Transaction List" identifying only six reportable transactions executed by promoter entity Anglo Capital.

234. Levine failed to identify the five intermediary transaction tax schemes he organized and/or promoted using First Active (involving target companies VMG; NOF, LLC; 254 W. 54th Street; PAF; and UNO Estates Limited), the Knatten intermediary transaction tax scheme he organized and/or promoted using ILP Capital, and two of the intermediary transaction tax schemes he organized and/or promoted using Anglo Capital (involving target companies H.F. Allen Estate Co. and Sandbay Investments, Inc.). Levine was required to maintain a list that included these intermediary transaction tax schemes because he was a material advisor as to these transactions that he organized and/or promoted. Accordingly, Levine has engaged in conduct subject to penalty under IRC § 6708, and should be enjoined from engaging in any further conduct that violates IRC § 6708.

**D.   Necessity of Injunction**

235. The IRS has identified at least 13 intermediary transaction tax schemes, at least 75 state tax credit transaction tax schemes, and at least 2 other tax avoidance schemes that were organized, promoted and/or executed by Levine. Levine has assisted and participated in these tax avoidance tax schemes for at least five years. The Promoter Entities improperly deducted

approximately $515,405,153 in bad debt losses for tax years 2005 through 2010. The intermediary transaction, state tax credit transaction, and other tax avoidance tax schemes have thus generated federal income tax liabilities of over $129 million.

236. Levine, a knowledgeable tax attorney with over 25 year of experience in the tax law sector, is knowledgeable about Notices 2001-16 and 2008-111 and the disclosure requirements under § 6707 and § 6708. However, Levine's intricate knowledge of tax law did not deter him from organizing, promoting and/or executing the intermediary transaction tax schemes, state tax credit tax schemes, and other tax avoidance schemes. Indeed, Levine used his knowledge of tax law to try to disguise certain intermediary transactions as dissimilar from the tax avoidance schemes set forth in Notices 2001-16 and 2008-111.

237. Levine continues to practice as a tax attorney at Moritt Hock & Hamroff LLP and is in a position to continue to organize, promote and execute intermediary transactions and state tax credit transactions. According to the law firm's website, Levine's practice "includes tax planning with respect to real estate, corporate and securities transactions." Levine currently "serves as counselor to a wide variety of business entities with respect to partnership and limited liability company operating agreements, shareholder agreements and other corporate structures."

## INJUNCTION UNDER IRC § 7402

238. Paragraphs 1 to 237 are realleged and incorporated herein.

239. IRC § 7402(a) authorizes a district court to issue orders of injunction as necessary and appropriate for the enforcement of the internal revenue laws. The remedies provided under IRC § 7402(a) are in addition to and not exclusive of any and all other remedies the United States may have to enforce the internal revenue laws.

240.  Levine engaged in numerous activities that interfered with the enforcement of the internal revenue laws.

241.  Levine interfered with the enforcement of the internal revenue laws by arranging and participating in intermediary transactions that thwarted the Government's efforts to collect taxes due from corporations selling built-in gain assets.  Because the Promoter Entities acquiring the target corporations were ultimately rendered insolvent, there was nothing for the Government to collect once the bad debt deductions claimed by the Promoter Entities were disallowed.  Levine continued to promote or recommend intermediary transactions to his clients even after having been made aware of the IRS's position regarding intermediary transactions in the course of representing a client involved in an IRS examination of an intermediary transaction.

242.  Levine also interfered with the enforcement of the internal revenue laws by arranging and participating in state tax credit transactions that thwarted the Government's efforts to collect taxes due from corporations selling state-issued tax credits.  Because the Promoter Corporations reporting the income from the sale of state tax credits were ultimately rendered insolvent, there was nothing for the Government to collect once the bad debt deductions claimed by the Promoter Corporations were disallowed.

243.  Levine further authorized payments to U.S. persons and entities from the escrow accounts of Herrick Feinstein on behalf of the Promoter Entities, but failed to obtain Forms W-9 and to issue Forms 1099 for those payments.  As a result, these payments were not reported among the income of the persons and entities receiving the payments and were not identified by the IRS prior to the expiration of the statute of limitations, including hundreds of thousands of dollars in payments to entities in which Levine or his close associate Ron Katz held an interest at the time of the payment.

244.  Levine also authorized payments to foreign persons and entities from the escrow accounts of Herrick Feinstein on behalf of the Promoter Entities, but failed to obtain Forms W-8 and to file Forms 1042 for those payments.  As a result, no withholding tax was collected on the payments to these foreign entities controlled by McNabola.  Levine knew of the obligation to provide and file these forms, as he was copied on correspondence from a return preparer notifying Tim Conn Vu of this obligation.

245.  Levine also interfered with the enforcement of the internal revenue laws by assisting and participating in a scheme to acquire partnership units in One CityPlace LP without paying taxes on the taxable income generated by One CityPlace LP.  Levine assisted Queenswood in acquiring the partnership units in One CityPlace LP, which owned a commercial real estate building.  Anglo Capital, which owned Queenswood beginning in or around June 2006, offset Queenswood's income with bad debt deductions.  Shortly before One CityPlace LP sold the commercial real estate building, Levine arranged and participated in the transfer of the partnership units to himself and other participants in the tax avoidance scheme.  This tax avoidance scheme was profitable for Levine and the other participants because Anglo Capital absorbed the tax liabilities related to Queenswood's ownership of the partnership units using bad debt losses.  The IRS incurred costs associated with making a jeopardy assessment against Anglo Capital for tax year 2006 and issuing and serving Notices of Levy to seize the proceeds to be paid to the participants in this tax avoidance scheme.

246.  WHEREFORE, the United States demands judgment against Defendant as follows:

a.      That this Court find that Levine has engaged in conduct subject to penalty under IRC § 6700 and that injunctive relief under IRC § 7408 is appropriate to prevent a recurrence of that conduct;

b.    That this Court find that Levine has engaged in conduct subject to penalty under IRC § 6707 and that injunctive relief under IRC § 7408 is appropriate to prevent a recurrence of that conduct;

c.    That this Court find that Levine has engaged in conduct subject to penalty under IRC § 6708 and that injunctive relief under IRC § 7408 is appropriate to prevent a recurrence of that conduct;

d.    That this Court find that Levine engaged in conduct substantially interfering with the administration and enforcement of the internal revenue laws and that injunctive relief under IRC § 7402 is appropriate to prevent recurrence of that conduct;

e.    That this Court, pursuant to IRC §§ 7402 and 7408, enter a permanent injunction prohibiting Levine (individually and through any other name or entity) and those persons acting in concert with him, from directly or indirectly:

i.    Establishing, organizing, promoting, selling, advising with respect to, or assisting or participating in any intermediary transaction, any arrangement or plan that is expected to obtain the same or similar types of tax consequences and that is either factually similar or based on the same or similar tax strategy of an intermediary transaction, or any other plan or arrangement that involves the acquisition of shares of corporate stock and the sale of corporate assets and is designed to reduce or eliminate tax liabilities;

ii.    Establishing, organizing, promoting, selling, advising with respect to, or assisting or participating in any state tax credit transaction, any arrangement or plan that is expected to obtain the same or similar types of tax consequences and that is either factually similar or based on the same or similar tax strategy of a state tax credit transaction, or any

60

other plan or arrangement that involves the sale or acquisition of state tax credits and is designed to reduce or eliminate tax liabilities;

      iii.     Organizing, promoting or selling any plan or arrangement for a fee or anticipated fee that would have the effect of securing any tax benefit for the participants in that plan or arrangement;

      iv.     Establishing, organizing, advising with respect to, or assisting or participating in any plan or arrangement for a fee that has a substantial purpose of securing a tax benefit, or unlawfully evades the assessment or collection of correct federal tax liabilities;

      v.     Engaging in conduct subject to penalty under IRC § 6700, including, but not limited to,  making, in connection with the organization or sale of any plan or arrangement, any statement about the securing of any tax benefit that Levine knows or has reason to know is false or fraudulent as to any material matter;

      vi.     Engaging in conduct subject to penalty under IRC § 6707, including but not limited to, failing to file a return or statement with the IRS that identifies and describes any reportable or listed transaction, any potential tax benefits expected to result from that transaction, as well as other information required by statute;

      vii.     Engaging in conduct subject to penalty under IRC § 6708, including but not limited to, failing to furnish the IRS with a list that identifies all customers who have participated in a listed transaction when the IRS requests such a list and the list is required to be maintained pursuant to statute; and

      viii.     Engaging in any other conduct that interferes with the administration or enforcement of the internal revenue laws, including but not limited to implementing and

participating in the intermediary transactions, state tax credit transactions, or any similar tax schemes.

      f.     That this Court, pursuant to IRC §§ 7402 and 7408, enter an injunction requiring Levine to contact all persons whom he has assisted or advised with respect to any tax scheme, including but not limited to those schemes described in this Complaint or identified through further discovery, and inform these persons of the Court's findings and attach a copy of the permanent injunction, and to file with the Court, within thirty days of the date on which the permanent injunction is entered, a declaration signed under penalty of perjury certifying that he has contacted all such persons;

      g.     That this Court, pursuant to IRC § 7402, enter an injunction requiring Levine to produce to counsel for the United States a list identifying (by name, address, e-mail address, phone number, and Social Security or other tax identification number) all of the persons and entities who have participated in any tax scheme with Levine for any of the tax years 2005 to the present;

      h.     That this Court order that the United States is permitted to engage in post-injunction discovery to monitor and ensure compliance with the permanent injunction;

      i.     That this Court retain jurisdiction over this action for purposes of implementing and enforcing the final judgment and any additional orders necessary and appropriate to the public interest; and

      j.     That this Court grant the United States such other and further relief, including costs, as this Court deems appropriate.

Dated:      New York, New York
            June 4, 2014

                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York

                    By:       _____
                              ALICIA M. SIMMONS
                              TARA M. La MORTE
                              Assistant United States Attorneys
                              86 Chambers Street, Third Floor
                              New York, New York  10007
                              Telephone: (212) 637-2697/2746
                              Fax: (212) 637-2686
                              Email:   alicia.simmons@usdoj.gov
                                       tara.lamorte2@usdoj.gov

63

# Exhibit A

| No. | Promoter Entity | Entity Holding or Receiving State Tax Credits | Approx Date Transaction Commenced |
|---|---|---|---|
| 1 | Agate/First Active Capital | 411 State Member | 12/2008 |
| 2 | Agate/First Active Capital | 1205 State Historic, LLC | 2005 |
| 3 | Agate/First Active Capital | 1329, LLC | 6/1/2003 |
| 4 | Agate/First Active Capital | 1601 State Historic Investor LLC/1601 Washington | 2004 |
| 5 | Agate/First Active Capital | 1801 Delmar, LLC (Franklin School project) | 5/1/2006 |
| 6 | Agate/First Active Capital | 1891 Locust State Member, LLC | 12/2008 |
| 7 | Agate/First Active Capital | 1911 Locust State Member, LLC | 5/12/2009 |
| 8 | Agate/First Active Capital | 2004 Historic Credit Investors, LLC | 2004 |
| 9 | Agate/First Active Capital | 2005 Historic Credit Investors, LLC | 2005 |
| 10 | Agate/First Active Capital | 2006 Historic Credit Investors, LLC | 2006 |
| 11 | Agate/First Active Capital | 2635 West Paseo LLC | 2006 |
| 12 | Agate/First Active Capital | 3630 Grandel Square, LLC | 11/19/2004 |
| 13 | Agate/First Active Capital | ACG Development LLC | 2004 |
| 14 | Agate/First Active Capital | ACG Drake Development LLC | 2005 |
| 15 | Agate/First Active Capital | ACG Oaks Development, LLC | 2006 |
| 16 | Agate/First Active Capital | Adler State Member | 2/12/2009 |
| 17 | Agate/First Active Capital | Alanson State Partner, LLC | 1/2008 |
| 18 | Agate/First Active Capital | Armour Boulevard State Credit Fund, LLC | 5/11/2006 |
| 19 | Agate/First Active Capital | Atlas Life State Member, LLC | 03/2009 |
| 20 | Agate/First Active Capital | CGA Investors LLC | 12/1/2003 |
| 21 | Agate/First Active Capital | Down by the River State Member LLC | 07/2009 |
| 22 | Agate/First Active Capital | Downtown Hutch State Credit Partner, LLC | 2008 |
| 23 | Agate/First Active Capital | Ford Building State Member, LLC | 2/17/2009 |
| 24 | Agate/First Active Capital | FPL, LLC | 6/22/2005 |
| 25 | Agate/First Active Capital | Grand & Olive State Credit Investors, LLC | 6/27/2007 |
| 26 | Agate/First Active Capital | Grant Historic, LLC | 2006 |
| 27 | Agate/First Active Capital | HD Lee State Member, LLC | 04/2008 |
| 28 | Agate/First Active Capital | KBS Manager, LLC | 11/2005 |
| 29 | Agate/First Active Capital | LIHTC Partners, LLC | 2004 |
| 30 | Agate/First Active Capital | LisArt Stratford LIHTC Fund II LLC | 5/8/2008 |
| 31 | Agate/First Active Capital | Locust Historic LLC | 2006 |
| 32 | Agate/First Active Capital | Mayo H&L State Member, LLC | 3/19/2008 |
| 33 | Agate/First Active Capital | MCLI State, LLC | 2006 |
| 34 | Agate/First Active Capital | MEF Drake Investors 2005, LLC | 2005 |
| 35 | Agate/First Active Capital | MEF Investors 2004, LLC | 2005 |
| 36 | Agate/First Active Capital | Moose State Partners, LLC | 2006 |
| 37 | Agate/First Active Capital | Parkland State Member, LLC | 12/2006 |
| 38 | Agate/First Active Capital | Paul Brown State Cr Invest LLC | 11/20/2003 |
| 39 | Agate/First Active Capital | RCDA State Member LLC | 5/6/2008 |

| | | | |
|---|---|---|---|
| 40 | Agate/First Active Capital | SMI State HTC Investor, LLC | 8/4/2009 |
| 41 | Agate/First Active Capital | South Pier Managing Member, LLC | 07/2008 |
| 42 | Agate/First Active Capital | Spring Street Lofts State Member, LLC | 12/23/2008 |
| 43 | AIB Capital | City Hospital Laundry State Member LLC | 10/2009 |
| 44 | AIB Capital | New Holdings State Member, LLC | 06/2009 |
| 45 | BOI Capital | Boonville Credit Fund, LP | 10/30/2009 |
| 46 | BOI Capital | Century Tower State Credit Fund, LP | 2/13/2008 |
| 47 | BOI Capital | Countryview Estates State Credit Fund I, LP | 2/13/2008 |
| 48 | BOI Capital | Divine Estates Credit Fund, LP | 2/13/2008 |
| 49 | BOI Capital | Drake Hotel Credit Fund, LP | 2/13/2008 |
| 50 | BOI Capital | Ely-Walker Credit Fund, LP | 10/1/2008 |
| 51 | BOI Capital | Franciscan Villa Credit Fund, LP | 2/13/2008 |
| 52 | BOI Capital | Frisco Station Credit Fund, LP | 2/13/2008 |
| 53 | BOI Capital | Mark Twain Credit Fund, LP | 12/17/2007 |
| 54 | BOI Capital | Missouri LIHTC Fund, LP | 2/13/2008 |
| 55 | BOI Capital | Oaks Credit Fund, LP | 12/17/2007 |
| 56 | BOI Capital | Perryville Manor Credit Fund, LP | 2/13/2008 |
| 57 | BOI Capital | Plainview Estates Credit Fund, LP | 2/13/2008 |
| 58 | BOI Capital | San Regis Credit Fund, LP | 10/1/2008 |
| 59 | BOI Capital | SCS Breezeway I Fund (American Equity Fund) | 12/21/2009 |
| 60 | BOI Capital | SCS Cape Meadows, LLC | 11/15/2008 |
| 61 | BOI Capital | SCS Jamison, LLC | 10/30/2009 |
| 62 | BOI Capital | SCS Jessica Estates III, LLC | 11/15/2008 |
| 63 | BOI Capital | SCS Messenger, LLC | 12/7/2009 |
| 64 | BOI Capital | SCS Northwood MF, LLC | 11/15/2008 |
| 65 | BOI Capital | SCS Nu Elm, LLC | 10/30/2009 |
| 66 | BOI Capital | SCS Park Ridge, LLC | 11/15/2008 |
| 67 | BOI Capital | SCS Sand Hills LLC | 12/21/2009 |
| 68 | BOI Capital | SCS Schultz Fund - GP Interest | 2/22/2010 |
| 69 | BOI Capital | SCS Trinity Village, LLC | 12/21/2009 |
| 70 | BOI Capital | SCS Tudor Fund - /Warepool 2A, LLC | 12/11/2009 |
| 71 | BOI Capital | Springfield Commons Credit Fund, LP | 2/13/2008 |
| 72 | BOI Capital | St. Joseph Housing Credit Fund, LP | 2/13/2008 |
| 73 | BOI Capital | State Credit Syndicators II, LLC | 2/13/2008 |
| 74 | BOI Capital | Zahn Credit Fund, LP | 12/17/2007 |
| 75 | Anglo Capital | SCS Iowa, Inc. | 12/12/2007 |